## UNITED STATE DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHERI COLEMAN, DUANE RUSSELL,  Case No. 2:25-cv-10556
and TAYLOR CARMICHAEL,    Judge
            Magistrate

    Plaintiffs,

v.

DMI GC Holdings, LLC d/b/a QUALFON,

    Defendant.

---

Gregory, Moore, Brooks, Clark & Helton, PC
Matthew J. Clark (P76690)
Rachel N. Helton (P61885)
Attorneys for Plaintiff
28 W. Adams, Ste. 300
Detroit, MI 48226
(313) 964-5600
(313) 964-2125 (fax)
matt@unionlaw.net
rachel@unionlaw.net

The Washington Law Firm, PLLC
Melissa E. Washington (District of Columbia Bar No. 1615085)
1050 Connecticut Ave. NW, Ste. 500
Washington, DC 20036
(202) 770-3440
(202) 991-2992 (fax)
mw@washingtonfirmpllc.com

---

## PLAINTIFFS' COMPLAINT AND JURY DEMAND

## I.  INTRODUCTION

Plaintiffs tolerated an obvious and pervasive culture of racial discrimination throughout the entirety of their employment with the Defendant. As African Americans, they were treated less favorably than their white co-workers, forced to assume a heavier workload than their white co-workers, subjected to demeaning comments about members of their race, subjected to work restrictions on the basis of their race, and made to feel so uncomfortable and unwelcome that they left as soon as they could find replacement employment. When Plaintiff Coleman voiced opposition to this mistreatment and advocated for herself and her co-plaintiffs, the Defendant retaliated by terminating her employment. Plaintiffs Cheri Coleman, Duane Russell, and Taylor Carmichael ("Plaintiffs"), through Counsel, and for their Complaint for Damages against DMI GC Holdings, LLC d/b/a Qualfon ("Qualfon" or "Defendant") state as follows:

1. This is an action for actual damages, statutory damages, and legal fees and expenses filed by Plaintiffs against Defendant for Defendant's improper actions and conduct which violate Title VII of the Civil Rights Act of 1964 (Title VII); 42 U.S.C. §1981; and the Elliott-Larsen Civil Rights Act, M.C.L 37.2101 et. seq.

## II.   __PARTIES__

2. Plaintiff Cheri Coleman is a resident of Macomb County, Michigan, where she resided during the period of time relevant to this lawsuit, and is a former employee of the Defendant.

3. Plaintiff Duane Russell is a resident of Wayne County, where he resided during the period of time relevant to this lawsuit, and is a former employee of the Defendant.

4. Plaintiff Taylor Carmichael is a resident of Macomb County, Michigan, where she resided during the period of time relevant to this lawsuit, and is a former employee of the Defendant.

5. Defendant DMI GC Holdings d/b/a Qualfon is a corporation headquartered in Highland Park, Wayne County, Michigan with worksites throughout the United States, Central and South America and the Philippines.

6. Defendant DMC GC Holdings d/b/a Qualfon is a corporation organized under the laws of the State of Michigan and is registered to do business with the Michigan Secretary of State.

7. Defendant was an employer of Plaintiffs for all purposes of liability in this lawsuit.

### III.   JURISDICTION AND VENUE

8. Plaintiffs' claims arise under both federal and Michigan state law.

9. This Court has federal subject matter jurisdiction over this case pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 et. seq.

10. This Court has supplemental jurisdiction over the state law claims for discrimination under the Elliot-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et. seq, because they are so related to the federal claims that they form part of the same case or controversy between Plaintiffs and Defendant.

11. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), because all or a substantial part of the events giving rise to the claims in this lawsuit occurred in Wayne County, Michigan.

## IV.   FACTUAL ALLEGATIONS
### A.  Plaintiff Cheri Coleman

12. Plaintiffs restate and incorporate the allegations contained in Paragraphs 1 through 11 as if fully written herein.

13. Plaintiff Cheri Coleman was employed by Defendant during the incidents at issue in this lawsuit.

14. Plaintiff Coleman was employed at the Defendant's call center located at 13700 Oakland Avenue in Highland Park, Michigan from September 2023 to March 2024.

15. Plaintiff Coleman is a Black woman with over twenty years of experience in Human Resources and Talent Acquisition, working for some of the most prestigious institutions in the country since 2000 and holding both Professional in Human Resources ("PHR") and Lean Six Sigma Green Belt certifications.

16. In September 2023, Defendant hired Plaintiff Coleman to be a Talent Acquisition Manager. In that role, she was responsible for hiring and directly managing recruiters to work on her team. In turn, her team was responsible for attracting and recruiting talented applicants for one of Defendant's clients: the United Services Automobile Association ("USAA").

17. Upon her hire, one of Plaintiff Coleman's job requirements was to hire additional recruiters to work on the USAA account. Between October 2023 and January 2024, she hired 5 recruiters whom she directly supervised: Gerald Kennedy ("Kennedy"), Asha Carr ("Carr"), Duane Russell ("Plaintiff Russell"), Taylor Carmichael ("Plaintiff Carmichael"), and Charmaine Neal ("Neal"). Kennedy, Carr, Russell, Carmichael, and Neal are all Black.

18. Plaintiff Coleman reported directly to Kali Karibo ("Karibo"), a Senior Talent Acquisition Manager who is white.

19. When Qualfon hired Plaintiff Coleman in September 2023, she was the only Black leader on the Company's United States Talent Acquisition team. Her direct supervisor, Karibo, directly supervised three other leaders: Kyle Clark, ("Clark"), a Recruiting Supervisor; Valerie Davis ("Davis"), a Recruiting Supervisor; and Jenna Lozon ("Lozon"), a Recruiting Manager.  Clark, Davis, and Lozon are all white.

20. In addition to directly supervising Kennedy, Carr, Plaintiff Russell, Plaintiff Carmichael and Neal, Karibo also assigned Plaintiff Coleman to manage an

additional 10-15 white recruiters who reported directly to Karibo. These 10-15 recruiters were white and worked remotely, performing recruiting functions for both USAA and other Qualfon accounts.

21. Karibo did not permit Plaintiff Coleman or the five Black recruiters whom she hired to work remotely. Karibo did not require any white recruiters or white supervisors, like Clark, Davis or Lozon, to work onsite, but only required Plaintiff Coleman and her Black direct reports to work full-time in the office. There was no legitimate reason that Plaintiff Coleman and her team could not work remotely. While the five Black recruiters Plaintiff Coleman hired only performed work for USAA, the 10-15 white recruiters she managed also recruited for USAA. Recruitment tasks for USAA could easily be performed from home, as demonstrated by the white recruiters.

22. At the start of Plaintiff Coleman's tenure with Qualfon, she participated in a week-long training with USAA in Texas. At the training, she learned about USAA's equal opportunity employer and affirmative action compliance requirements as a federal contractor. As a federal contractor, USAA was required to invite applicants and employees to voluntarily self-identify race, gender, disability, and veteran status and report data on the demographic breakdown of applicants and employees. Plaintiff Coleman also had experience with these requirements during her previous employment with the American Automobile Association ("AAA"). USAA was a new account for

Defendant and Defendant did not comply with these requirements prior to her hire.

23. Plaintiff Coleman's team's primary goal was to recruit classes of 56 new call center agents for USAA each month. Under Plaintiff's leadership, her team accomplished this goal and onboarded classes of 56 new agents in December 2023, January 2024 and February 2024.

24. Throughout Fall 2023 and January/February 2024, Plaintiff Coleman received regular praise from Karibo about her team's accomplishments and realization of their goals.

25. Immediately after beginning her employment with Qualfon, Plaintiff Coleman observed that she was set up to fail because Qualfon did not have an Applicant Tracking System ("ATS").

26. ATS is the industry standard for large-scale recruitment companies. An ATS allows numerous recruiters to input information about candidates and open roles and that information can be seen by the rest of the team. Instead of an ATS, Qualfon had 30+ members of the Talent Acquisition team using a Microsoft Excel spreadsheet for applicant tracking. This was completely non-functional and the sheet was constantly inaccurate and out-of-date. Recruiters would often accidentally delete entire columns and rows of the spreadsheet, putting the entire team on hold for up to a day while the errors were fixed.

27. Plaintiff Coleman requested that Qualfon obtain an ATS at least 20 times throughout November and December 2023 due to the constant errors and mistakes that others made on the spreadsheet. When recruiters or Clark, Davis, and Lozon made mistakes in the spreadsheet, Karibo and Qualfon management recognized this as a routine error due to the problematic reporting mechanism and would reassure them that these mistakes were routine.

28. During the course of her employment, Plaintiff Coleman complained continually to Karibo about Qualfon's recruiting practices for USAA. Plaintiff Coleman repeatedly explained to Karibo that in order to be federally compliant, Qualfon needed to publish an equal opportunity employer statement to USAA applicants and incorporate diversity, equity, and inclusion ("DEI") practices into its recruitment process. This included reporting candidate demographic information, which was required because USAA was a federal contractor and subject to affirmative action requirements. Karibo replied incorrectly that Qualfon did not need to record and track candidate information like race.

29. It appeared that Karibo lacked basic knowledge of law concerning human resources and employment matters. For example, when Plaintiff Coleman told Karibo she was having trouble with Qualfon's insurance paying for her medical prescriptions, Karibo instructed Plaintiff Coleman to simply provide

a document to Karibo listing all of her pre-existing medical conditions and which prescriptions she was prescribed, which clearly violated Plaintiff Coleman's right to medical privacy.

30. Plaintiff Coleman also complained to Karibo that Qualfon did not ask uniform and legally compliant interview questions. Karibo again responded dismissively, stating, "We have been doing it this way for 6 years; these guys know what they are doing."

31. Plaintiff Coleman spoke to Karibo about Qualfon's legally non-compliant recruitment practices at least weekly from September 2023 to February 2024, beginning her first week of employment at Qualfon.

32. When Karibo did not adequately address her concerns, Plaintiff Coleman approached Karibo's supervisors, Chris Serafini ("Serafini"), the Vice President of Agent Talent Acquisition and Maria Bruno ("Bruno"), the Senior Director of Talent Acquisition. Both Serafini and Bruno are white. Plaintiff Coleman complained to Serafini and Bruno in or about February 2024. She repeated that Qualfon needed to publish an equal opportunity employer statement to applicants, incorporate fair and standardized interview questions, and advertise to protected classes.

33. Plaintiff Coleman told Serafini on several occasions that there was no way Qualfon could be legally compliant with affirmative action hiring requirements without an ATS. She even sent Serafini the names of several

reputable ATS systems where he could schedule a free demo. Serafini and Bruno dismissed Plaintiff Coleman's concerns and responded to this by stating: "We hire the most qualified person regardless of race." Tellingly, Plaintiff Coleman had never mentioned race to Serafini, Bruno, or Karibo.

34. Plaintiff Coleman also raised her concerns about Qualfon's refusal to incorporate DEI practices and publish an equal opportunity employer statement during marketing meetings throughout December 2023. Qualfon was in the process of redesigning its website and social media and Plaintiff Coleman mentioned that it should include an equal opportunity employer statement to be seen by potential applicants on these platforms.

35. Chelsea Roehr, ("Roehr"), a white member of Qualfon's marketing team, responded: "We don't focus on race, we hire the most qualified candidate."

36. Despite Plaintiff Coleman's repeated efforts, Qualfon management refused to recognize or implement hiring practices that comply with affirmative action requirements, which included requesting and documenting applicants' race, gender, disability and veteran statuses.

37. Despite Qualfon management's repeated assertions that their hiring processes were devoid of racial bias, Karibo' s actions indicated otherwise.

38. One manner in which this was demonstrated was by the fact that all Black recruiters and Plaintiff Coleman were required to work in-person, while all white recruiters and supervisors were permitted to work remotely.

39. In addition, Plaintiff Coleman was forced to perform more work than her similarly-situated white co-workers. One of Plaintiff Coleman's job duties was to ensure that recruitment reporting was up-to-date and to compile and analyze data input by recruiters. She was responsible for reporting this data at weekly meetings. Other Talent Acquisition leaders, like Clark, Davis, and Lozon, did not have this additional responsibility. Plaintiff Coleman was the only team member responsible for this task.

40. Karibo clearly displayed racial animus by making racially charged "jokes" in Microsoft Teams meetings. For example, in January 2024 during a Microsoft Teams meeting, Karibo joked with Tim Straka, ("Straka"), a White recruiter, that he should become a rapper and get "Little N" tattooed on his chest. "Little N" is a reference to the N -word which is a horrific and demoralizing racial slur. In the recruitment field, a capital "N" stands for the number of applicants that apply for the position, while a lowercase "n" stands for the number of employees from that recruitment who are still employed after 5 days.  Karibo and Straka clearly thought this was funny because "little n" had a dual meaning: the meaning commonly understood within the recruiting world and the racial slur known as "the n word". Plaintiff Coleman was so uncomfortable by her commentary that she immediately left the meeting.

41. One of Plaintiff Coleman's job responsibilities was to conduct monthly events for her team with different themes. Karibo attended all the events except for the one held in February, when the stated theme was Black History.

42. Plaintiff Coleman asked Karibo for a company credit card so she could buy supplies for her team meetings. At all previous employers, she had a company credit card. Karibo responded to Plaintiff Coleman's request by stating: "We don't give out credit cards to just anyone." Karibo instructed Plaintiff Coleman that if she wanted to make online purchases, she should call Bruno or Serafini so that they could use their company credit cards to make the purchases. This was inconvenient as Bruno and Serafini did not work onsite. This resulted in Plaintiff Coleman using her personal credit card to make purchases and then having to wait a week or more for Qualfon to reimburse her, often for up to $1000 worth of purchases.

43. Three of the five recruiters whom Plaintiff Coleman hired resigned after fewer than six months' employment with Qualfon, citing the racially discriminatory work environment and disparate treatment against Black employees perpetuated by Karibo and other members of Qualfon management.

44. In February 2024, Kennedy resigned after Karibo instructed Plaintiff Coleman to issue him a write-up that Plaintiff Coleman viewed as unwarranted, and that Plaintiff Coleman refused to issue.

45. Throughout the course of her employment with Qualfon, Plaintiff Coleman performed her job well and worked diligently to comply with all its expectations. However, Qualfon held her to a higher performance standard than her similarly situated white peers. Qualfon denied Plaintiff Coleman and her team the resources they needed to be successful and then criticized them and not their white peers for mistakes related to their lack of resources.

46. Initially when Plaintiff Coleman, along with Clark, Davis and Lozon reported inaccurate data to Qualfon due to mistakes that others made on the Excel Spreadsheet and its inadequacy as a reporting mechanism, Karibo and other members of Qualfon management would reassure them with words such as: "Don't worry, that happens all the time." However, after Plaintiff Coleman engaged in protected activity, Qualfon blamed her for all the mistakes and held her to a higher performance standard than her white colleagues.

47. On February 6, 2024, Karibo issued Plaintiff Coleman a written warning.

48. The warning largely criticized Plaintiff Coleman for inaccurate, late and missed reporting. However, as Plaintiff Coleman had explained to Karibo and Serafini on numerous occasions, she was unable to compile and present accurate and timely reports without an ATS and mistakes were made by all the recruiters and supervisors, not just Plaintiff Coleman.

49. The warning also criticized Plaintiff Coleman for information that members of the Acquisition Team had improperly reported on candidates and

requisitions. As Plaintiff Coleman had repeatedly stated to Karibo, Serafini and other members of Qualfon management, the Excel spreadsheet was not an appropriate tool for reporting and accurate reporting was impossible without an ATS.

50. Qualfon only criticized Plaintiff Coleman, the only Black leader on the team, for late or missing reporting data even though all leaders had late and missing reporting data. Plaintiff Coleman's similarly situated white peers were not criticized for errors in reporting; Qualfon excused mistakes included in reports created by white recruiters and team leaders.

51. In March 2024, Carr and Plaintiff Russell resigned, citing Karibo's disparate treatment of Black employees. Both specifically cited her practice of requiring Black employees to work exclusively in-person and allowing white employees to work remotely.

52. Carr authored a resignation letter in which she wrote: "[Karibo's] approach appears to involve micromanaging, particularly targeting the onsite African American staff, in contrast to the virtual recruiters (all non white or non POC) who seem to carry a lighter load."

53. Plaintiff Russell authored a resignation letter in which he wrote: "I cannot help but to feel that the favoritism has some form of racism involved since all the onsite recruiters were African American versus our counterparts."

54. On March 15, 2024, Plaintiff Coleman brought these resignation letters to Micah Hennings ("Hennings"), the Senior Regional Human Resources Manager, and Jovan Fisher-Fonseca ("Fisher-Fonseca"), the Regional Human Resources Manager.

55. On March 18, 2024, Qualfon terminated Plaintiff Coleman's employment citing alleged poor performance.

B. **Plaintiff Duane Russell**

56. Plaintiffs restate and incorporate the allegations contained in Paragraphs 1 through 55 as if fully written herein.

57. Plaintiff Duane Russell was employed by Defendant during the incidents at issue in this lawsuit.

58. Plaintiff Russell was employed at the Defendant's call center located at 13700 Oakland Avenue in Highland Park, Michigan from December 2023 to March 2024.

59. Plaintiff Russell is a Black man with four years of experience working in recruitment. He holds an associate's degree from Oakland Community College, a Bachelor of Arts degree in Business Management from Wayne State University and a Master's Degree in Employment and Labor Relations from Wayne State University.

60. In December 2023, Qualfon hired Plaintiff Russell to be a recruiter. Plaintiff Coleman conducted his first virtual interview and Karibo conducted his

second virtual interview. Plaintiff Coleman conducted a third in-person interview prior to hiring him.

61. Plaintiff Russell's direct supervisor was Plaintiff Coleman, and he worked on a team alongside Plaintiff Carmichael, and Carr.

62. Prior to his employment with Qualfon, Plaintiff Russell worked as a corporate recruiter/operations specialist for a large corporation for three years, while simultaneously completing his Master's Degree.

63. Plaintiff Russell's prior employer used an applicant tracking system (ATS), which allowed recruiters to track applicants and manage data. The ATS used by his prior employer was user-friendly, allowing each recruiter to contact candidates and manage required documents, communicate between fellow recruiters, and collaborate and share information with one another while constantly updating the information for all recruiters to see and access.

64. In Plaintiff Russell's employment both before and after Qualfon, and in his studies, he has never heard of another recruiting company not having an ATS and he understood it to be a tool essential to the performance of recruitment duties and an essential tool to ensuring fair and non-discriminatory recruiting.

65. Plaintiff Russell viewed Plaintiff Coleman as a competent and strong leader and an advocate for members of her team. He frequently heard her ask Karibo and other members of Qualfon management for an ATS. He frequently heard Karibo respond that Qualfon was planning to invest in an

ATS, but then kept delaying the date it would be purchased and implemented at Qualfon.

66. Plaintiff Russell was required to work exclusively in-person, along with Plaintiff Coleman, Plaintiff Carmichael and Carr. During his interview, Karibo told him that he was not permitted to work remotely because USAA would not allow it. However, Karibo also told him that in the future, that requirement could potentially be lifted.

67. Plaintiff Russell was required to attend nearly daily Microsoft Teams meetings with members of his team, along with remote recruiters. Plaintiff Russell, Plaintiff Coleman, Plaintiff Carmichael and Carr were the only Black recruiters he was aware of within Qualfon.

68. Although the remote and in-person recruiters participated in the Microsoft Teams meetings together, the two groups of employees never met in person.

69. Plaintiff Russell noticed that the teams that worked remotely controlled the onsite recruiters' work schedules. For example, remote recruiters would schedule in-person interviews and drug tests with candidates without consulting with the in-person recruiters or checking to make sure that they were available to interview the candidates or conduct the tests at that time.

70. Thus, the Black in-person recruiters had to perform all of the duties performed by the white remote recruiters, *plus* perform the additional duties of conducting in-person interviews, in-person drug tests, holding in-person

job fairs, and participating in other job requirements that could only be performed in person.

71. Plaintiff Russell frequently heard Plaintiff Coleman advocate with Karibo and members of Qualfon management to comply with USAA affirmative action and equal opportunity hiring practices, as well as incorporating DEI practices into Qualfon's recruitment practices.

72. Plaintiff Russell heard Karibo frequently respond: "We do not need DEI because we always hire the right candidate regardless of race."

73. Plaintiff Russell was present for the "joke" during the Microsoft Teams meeting in January 2024 between Karibo and Stratka about tattooing "Little N" on Stratka's chest and making it his "rapper name".

74. Following that meeting, Plaintiff Coleman held a meeting for her team members, including Plaintiff Russell, where the team expressed their feelings about why the incident shocked them and made them feel discriminated against.

75. Plaintiff Russell consistently felt that Karibo showed favoritism toward white employees and against Black employees. Karibo came and went to and from the Highland Park worksite at irregular intervals, while Plaintiff Coleman carried the workload for everything onsite.

76. While Karibo was ostensibly Plaintiff Coleman's supervisor and would speak over Plaintiff Coleman at meetings, Karibo's irregular presence, lack of

knowledge of the subject matter and lack of professionalism caused members of Plaintiff Coleman's team to view Plaintiff Coleman as the true supervisor.

77. Plaintiff Russell believed he could no longer continue to work at Qualfon after experiencing such obvious racial discrimination, and he stayed as long as he did only due to Plaintiff Coleman's presence there, because she was one of the best leaders he ever worked for.

78. Plaintiff Russell told Plaintiff Coleman and Karibo about his decision to leave Qualfon prior to telling his other team members, and he asked them both to keep this information confidential until Plaintiff Russell had an opportunity to reveal this information to his team members himself. Plaintiff Coleman respected his wishes. However, during a new hire meeting in which Karibo, Plaintiff Russell, Plaintiff Carmichael, and a new employee candidate were present, Karibo asked Plaintiff Russell in front of the new candidate if he had told Plaintiff Carmichael of his decision to leave yet. As this was mere moments after he had told Karibo of his decision to resign and asked her to keep the information confidential, Plaintiff Russell had not had an opportunity to tell Plaintiff Carmichael this information yet. Karibo's actions were not only mean-spirited and unprofessional, but clearly indicative of her failure to respect Black employees.

79. Plaintiff Russell was constructively terminated in March 2024 as a result of the racial hostility and discrimination he experienced at Qualfon.

## C. <u>Plaintiff Taylor Carmichael</u>

80. Plaintiffs restate and incorporate the allegations contained in Paragraphs 1 through 79 as if fully written herein.

81. Plaintiff Taylor Carmichael was employed by Defendant during the incidents at issue in this lawsuit.

82. Plaintiff Carmichael was employed at the Defendant's call center located at 13700 Oakland Avenue in Highland Park, Michigan from January 2024 to November 2024.

83. Plaintiff Carmichael is a Black woman with six years' experience working in recruitment.

84. In January 2024, Qualfon hired Plaintiff Carmichael to be a recruiter. Plaintiff Coleman conducted Plaintiff Carmichael's first virtual interview and Karibo conducted her second virtual interview.

85. Plaintiff Carmichael's direct supervisor was Plaintiff Coleman, and she worked initially on a team alongside Plaintiff Russell and Carr.

86. Prior to her employment with Qualfon, Plaintiff Carmichael worked first for a technical/automotive recruiting firm in-person in the metropolitan Detroit area, and then at a healthcare recruiting firm for three years. In that position, Plaintiff worked remotely, and the firm was based out of state.

87. Both of Plaintiff Carmichael's prior employers used applicant tracking systems (ATS), which allowed recruiters to track applicants and manage data.

The ATS's used by her prior employers were user-friendly, allowing each recruiter to contact candidates and manage required documents, communicate between fellow recruiters, and collaborate and share information with one another while constantly updating the information for all recruiters to see and access.

88. In Plaintiff Carmichael's employment both before and after Qualfon, she has never heard of another recruiting company not having an ATS and she understood it to be a tool essential to the performance of recruitment duties.

89. Plaintiff Carmichael viewed Plaintiff Coleman as a competent and strong leader and an advocate for members of her team. Upon Plaintiff Carmichael's hire, Plaintiff Coleman told Plaintiff Carmichael that she was building a team and, in addition to Carr and Plaintiff Russell, was seeking one more recruiter.

90. Plaintiff Coleman said she was advocating for members of her team to be permitted to work a hybrid remote/in-person schedule, to obtain an ATS, to obtain bonuses, and to hire one additional recruiter.

91. Plaintiff Carmichael found Plaintiff Coleman to be forthright as far as the team's material shortcomings, a strong advocate for her team members, and a sympathetic listener who allowed team members to vent about the frustrations they experienced on the job due to the lack of an ATS and the discrimination they faced on the job.

92. Plaintiff Carmichael and members of her team had more work to do than their remote-working counterparts because they were required to perform all of the remote responsibilities required of the remote recruiters, *plus* conduct both in-person interviews, drug tests, job fairs, and events which could only be conducted in person.

93. Plaintiff Carmichael and members of her team participated in daily Microsoft Teams meetings in which Plaintiff Coleman outlined the team's responsibilities for the day. Karibo would randomly join the meetings about half the time and when she did, she behaved in a dismissive manner toward Plaintiff Coleman and took over running the meeting from her.

94. Plaintiff Carmichael frequently heard Plaintiff Coleman ask Karibo and other members of Qualfon management for an ATS. Plaintiff Carmichael frequently heard Karibo respond that Qualfon was planning to invest in an ATS, but then kept delaying the date it would be purchased and implemented at Qualfon.

95. Plaintiff Carmichael heard Karibo make the following statement on multiple occasions: "We recruit and hire the best talent and don't need to look at a candidate's race."

96. Sometime in early 2024, Serafini said to Plaintiff Carmichael and members of her team: "We can't have the three of you working remotely until you build trust with us, because how would we know you are really working?"

97. Plaintiff Carmichael recalls that onsite employees were not permitted to have their cellular phones with them at their workspaces and Qualfon required them to store them in their lockers out of a concern that they might steal data from applicants. This caused inconvenience and disruption. For example, Plaintiff Carmichael had to give the Qualfon company phone number to caretakers and her children's school in case she needed to be contacted in an emergency.

98. By contrast, the white remote recruiters had access to all of the applicants' information and Qualfon apparently had no concerns that they might steal applicants' data. Moreover, there was no apparent discussion about the remote recruiters needing to "earn Qualfon's trust" before receiving access to applicant data.

99. Plaintiff Coleman was fired in March 2024, and was replaced as the on-site supervisor in Highland Park by Kyle Clark ("Clark"), a supervisor who had previously worked remotely and who had been supervised directly by Karibo.

100.   Prior to Qualfon's termination of Plaintiff Coleman, neither Karibo nor any other member of Qualfon management sought input from Plaintiff Carmichael, Plaintiff Russell, or Carr as to Plaintiff Coleman's performance as a supervisor or leader.

101.   Although Plaintiff Carmichael had seen Clark on screen during Microsoft Teams meetings prior to March 2024, the first time she saw him in person

was a week or two prior to Plaintiff Coleman's termination, when Karibo and Clark began making frequent in-person appearances at the Highland Park worksite. Following Plaintiff Coleman's termination, Plaintiff Carmichael rarely if ever saw Karibo onsite again.

102.    Clark succeeded Plaintiff Coleman as the supervisor over the in-person team, even though he lived in or near Flint, Michigan, which was a considerable distance away, and other members of the in-person team were as or better qualified to succeed Plaintiff Coleman as the in-person supervisor.

103.    When Clark became the manager, he had no experience in the recruitment profession apart from Qualfon and did not even know what an ATS was; Plaintiff Carmichael had to explain what an ATS was to him. Clark told Plaintiff Carmichael that Karibo had given him all the answers needed to pass the Lean Six Sigma Green Belt certification, the certification needed for project managers.

104.    Of Plaintiff Coleman's original team of Carr, Plaintiff Russell, Plaintiff Carmichael, Kennedy and Neal, Plaintiff Carmichael remained employed at Qualfon the longest, staying until November 2024.

105.    The team that replaced Plaintiff Coleman's team was Clark as supervisor, who supervised Plaintiff Carmichael along with her fellow recruiters

Marquita, Deanna and Kelly (last names unknown), all of whom are Black women.

106.    In July 2024, Karibo said to Plaintiff Carmichael: "We won't hire anyone from Highland Park to work remotely because they are not the type of people we can trust to work remotely."

107.    On one occasion in the summer of 2024, Plaintiff Carmichael was actively involved in a conversation with a Black co-worker named Dale (last name unknown). Karibo walked past Dale without acknowledging him, interrupted him, and began speaking to Plaintiff Carmichael as if Dale were not present. When Karibo left, Dale asked Plaintiff Carmichael: "What was that about? Is she [Karibo] racist?"

108.    Karibo left the employment of Qualfon in November 2024.

109.    Plaintiff Carmichael began actively searching for a new job in the fall of 2024 based on the disparate treatment and racism she experienced at her worksite, but did not find replacement employment until November 2024.

110.    Plaintiff Carmichael was constructively terminated in November 2024 because of the racial hostility and discrimination she experienced at Qualfon.

## V.    CLAIMS

### COUNT I—RACE DISCRIMINATION—HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT
**Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.**
**Plaintiff Coleman**

111.    Plaintiff Coleman restates and incorporates the allegations contained in Paragraphs 1 through 110 as if fully written herein.

112.    Plaintiff Coleman timely filed charges for these counts with the Equal Employment Opportunity Commission ("EEOC").

113.    After the EEOC issued Plaintiff Coleman's right-to-sue letter for these counts, Plaintiff Coleman timely filed this lawsuit within 90 days after their issuance.

114.    All administrative prerequisites to the filing of this lawsuit are satisfied.

115.    Defendant is an employer under Title VII of the Civil Rights Act of 1964, as amended.

116.    Plaintiff Coleman is an employee under Title VII of the Civil Rights Act of 1964, as amended.

117.    Plaintiff Coleman's race was a factor that made a difference in Defendant's decision to subject Plaintiff Coleman to the discriminatory treatment described above.

118.    Defendant, by its agents, representatives, and employees, discriminated against Plaintiff Coleman based on race.

119.    As described herein, Plaintiff Coleman was subjected to unwanted, repeated, recurrent and pervasive racial harassment by Defendant's employees and management that was known, or should have been known, to Defendant, but that Defendant failed to stop or correct.

120.   Plaintiff Coleman was terminated due to her race.

121.   Defendant is strictly, automatically, and directly liable for the racial discrimination committed by its high-level supervisors and managers.

122.   If Plaintiff Coleman were not African American, she would not have been treated in the manner described.

123.   Plaintiff Coleman's discriminatory treatment was part of a continuing violation dating back to her date of hire with the Defendant.

124.   As a direct and proximate result of Defendant's violations, Plaintiff Coleman suffered lost wages, emotional distress, anguish, and mental and physical pain and suffering. Therefore, Plaintiff Coleman is entitled to recover compensatory damages for past, present and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment to life to the maximum extent and amount by law.

125.   Defendant intentionally engaged in the above-described discriminatory practices with malice and/or reckless indifference to the legally protected rights of Plaintiff Coleman. Accordingly, Plaintiff Coleman is entitled to an award of punitive damages against Defendant. Plaintiff Coleman seeks relief as set forth below.

## COUNT II—RACE DISCRIMINATION—HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT

### 42 U.S.C. § 1981 et. seq.
### All Plaintiffs

126.    Plaintiffs restate and incorporate the allegations contained in Paragraphs 1 through 125 as if fully written herein.

127.    Plaintiffs are members of a protected minority class on the basis of their race.

128.    As employees, Plaintiffs had a contractual employment relationship with Defendant.

129.    During the course of Plaintiffs' employment with Defendant, Defendant violated Plaintiffs' rights by depriving them of their right to enjoyment of all benefits, privileges, terms and conditions of employment "as is enjoyed by white citizens" in violation of 42 U.S.C. §1981 as amended.

130.    Defendant, by its agents, representatives, and employees, discriminated against Plaintiffs based on their race.

131.    As described herein, Plaintiffs were subjected to unwanted, repeated, recurrent, and pervasive racial harassment and discrimination by Defendant's employees and management that was known, or should have been known, to Defendant, but that Defendant failed to stop or correct.

132.    Plaintiff Coleman was disciplined and later terminated due to her race.

133.    Plaintiffs Russell and Carmichael were constructively terminated due to their race.

134.   Defendant is strictly, automatically, and directly liable for the racial discrimination committed by its high-level supervisors and managers.

135.   Plaintiffs' discriminatory treatment was part of a continuing violation dating back to the date of their respective dates of hire with the Defendant.

136.   Defendant's discrimination and actual and constructive terminations of Plaintiffs altered the terms and conditions of Plaintiffs' employment and violated their right to make and enforce contracts pursuant to 42 U.S.C. § 1981.

137.   As a direct and proximate result of Defendant's violations, Plaintiffs suffered lost wages, emotional distress, anguish, and mental and physical pain and suffering. Therefore, Plaintiffs are entitled to recover compensatory damages for past, present and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment to life to the maximum extent and amount by law.

138.   Defendant intentionally engaged in the above-described discriminatory practices with malice and/or reckless indifference to the legally protected rights of Plaintiffs. Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendant. Plaintiffs seek relief as set forth below.

**COUNT III—RACE DISCRIMINATION—HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT**
**Elliott-Larsen Civil Rights Act, MCL 37.2101 et. seq.**
**All Plaintiffs**

139.    Plaintiffs restate and incorporate the allegations contained in Paragraphs
1 through 138 as if fully written herein.

140.    At all relevant times Plaintiffs and Defendant were individuals and entities
covered by and within the meaning of the Elliott-Larsen Civil Rights Act,
MC. 37.2101 et. seq. ("ELCRA").

141.    As set forth in the preceding paragraphs, Defendant subjected Plaintiffs
to a racially hostile work environment in violation of the ELCRA.

142.    As described herein, Plaintiffs were subjected to unwanted, repeated,
recurrent and pervasive racial harassment by Defendant's employees and
management that was known, or should have been known, to Defendant, but
that Defendant failed to stop or correct.

143.    Plaintiffs' race was a factor that made a difference in Defendant's decision
to not address Plaintiff Coleman's complaints of racial discrimination.

144.    Plaintiffs were disciplined and terminated or constructively terminated by
Defendant due to their race.

145.    Defendants are vicariously liable for the racial discrimination committed
by its high-level supervisors and managers, who were acting as respondeat
superior within the scope of their employment.

146.    As a direct and proximate result of Defendant's violations, Plaintiffs
suffered lost wages, emotional distress, anguish, and mental and physical pain
and suffering. Therefore, Plaintiffs are entitled to recover compensatory

damages for past, present and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life to the maximum extent and amount by law.

## COUNT IV—RETALIATION
### Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
### Plaintiff Coleman

147.   Plaintiff Coleman restates and incorporates the allegations contained in Paragraphs 1 through 146 as if fully rewritten herein.

148.   Plaintiff Coleman engaged in activity protected by Title VII, 42 U.S.C. § 2000e, et. seq. when she complained of the racially discriminatory work conditions that she and other employees were experiencing.

149.   Defendant was aware of Plaintiff Coleman's protected activity through numerous complaints, grievances and reports submitted by Plaintiff Coleman.

150.   Defendant retaliated against Plaintiff Coleman by disciplining and ultimately terminating her due to the exercise of protected activity.

151.   Defendant's termination of Plaintiff Coleman's employment on this basis violates Title VII.

152.   As a direct and proximate result of Defendant's violations, Plaintiff Coleman suffered lost wages, emotional distress, anguish, and mental and physical pain and suffering. Therefore, Plaintiff Coleman is entitled to recover compensatory damages for past, present and future pecuniary and non-

pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment to life to the maximum extent and amount by law.

153.   Defendant intentionally engaged in the above-described retaliatory practices with malice and/or reckless indifference to the legally protected rights of Plaintiff Coleman. Accordingly, Plaintiff Coleman is entitled to an award of punitive damages against Defendant. Plaintiff Coleman seeks relief as set forth below.

**COUNT V—RETALIATION**
**42 U.S.C. § 1981 et. seq.**
**Plaintiff Coleman**

154.   Plaintiff Coleman restates and incorporates the allegations contained in Paragraphs 1 through 153 as if fully rewritten herein.

155.   Plaintiff Coleman engaged in activity protected by 42 U.S.C. § 1981, et. seq. when she complained of the racially discriminatory work conditions that she and other employees were experiencing.

156.   Defendant was aware of Plaintiff Coleman's protected activity through numerous complaints, grievances and reports submitted by Plaintiff Coleman.

157.   Defendant retaliated against Plaintiff Coleman by disciplining and ultimately terminating her due to the exercise of protected activity.

158.   Defendant's termination of Plaintiff Coleman's employment on this basis violates 42 U.S.C. § 1981.

159.   Defendant intentionally engaged in the above-described retaliatory practices with malice and/or reckless indifference to the legally protected rights of Plaintiff Coleman. Accordingly, Plaintiff Coleman is entitled to an award of punitive damages against Defendant. Plaintiff Coleman seeks relief as set forth below.

## COUNT VI—RETALIATION
**Elliott-Larsen Civil Rights Act, MCL 37.2101 et. seq.**
**Plaintiff Coleman**

160.   Plaintiff Coleman restates and incorporates the allegations contained in Paragraphs 1 through 159 as if fully rewritten herein.

161.   Plaintiff Coleman engaged in activity protected by ELCRA when she complained of the racially discriminatory work conditions that she and other employees were experiencing.

162.   Defendant was aware of Plaintiff Coleman's protected activity through numerous complaints, grievances and reports submitted by Plaintiff Coleman.

163.   Defendant retaliated against Plaintiff Coleman by disciplining and ultimately terminating her due to the exercise of protected activity.

164.   Defendant's termination of Plaintiff Coleman on the above basis is a violation of ELCRA.

## VI.    DEMAND FOR JURY TRIAL

165.    Plaintiffs demand trial by jury on all claims.


## VII.    PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment against Defendant as follows:

a.  Declare that Defendant violated all Plaintiffs' under 42 U.S.C. § 1981 et. seq. and the ELCRA;

b.  Declare that Defendant violated Plaintiff Coleman's rights under Title VII;

c.  Award Plaintiffs the maximum extent of all damages to which they are entitled, including but not limited to, lost wages and benefits, monetary losses, back pay, front pay, all non-economic damages (including for emotional and physical pain, suffering, inconvenience, mental anguish and loss of enjoyment to life), liquidated damages, punitive damages, exemplary damages, and all other damages allowed by law;

d.  Award Plaintiffs' counsel reasonable attorney fees and costs;

e.  Award Plaintiffs pre-judgment and post-judgment interest; and

f.  Award Plaintiff such further relief as the court deems necessary and proper in the public interest.

Respectfully submitted,

/s/ Matthew J. Clark
Matthew J. Clark (P76690)
/s/ Rachel N. Helton
Rachel N. Helton (P61885)
Gregory, Moore, Brooks, Clark & Helton, PC
28 W. Adams, Ste. 300
Detroit, MI 48226
(313) 964-5600
(313) 964-2125 (fax)
matt@unionlaw.net
rachel@unionlaw.net

/s/ Melissa E. Washington
Melissa E. Washington
/s/ Ivey Best
Ivey Best
The Washington Law Firm, PLLC
1050 Connecticut Ave. NW, Ste. 500
Washington, DC 20036
(202) 770-3440
(202) 991-2992 (fax)
mw@washingtonfirmpllc.com
ib@washingtonfirmpllc.com